UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00552-GNS-DW

KESHIA CLEMONS,
as Mother and Next Friend of T.W.                                              PLAINTIFF


v.


SHELBY COUNTY BOARD OF EDUCATION;
SCOTT RICKE; JOHN LEEPER; and
JAMES NEIHOF, Superintendent                                              DEFENDANTS


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (DN 34), and Defendants' Motion for Summary Judgment (DN 35). The motions are ripe for adjudication. For the reasons outlined below, Defendants' motion is **GRANTED**, and Plaintiff's motion is **DENIED**.

## I.      STATEMENT OF FACTS AND CLAIMS

Plaintiff Keshia Clemons ("Clemons") is the mother of T.W., a minor who was an eighth grader and a ninth grader at Martha Layne Collins High School ("MLCHS") during the 2013-14 and 2014-15 academic years, respectively. Defendant Shelby County Board of Education ("SCBE") is the governing body overseeing Shelby County Public Schools, which includes MLCHS. Defendant Scott Ricke ("Ricke") was the MLCHS girls' tennis coach for the 2014 and 2015 seasons. Defendant Dr. James Neihof ("Neihof") is the Superintendent of SCBE, and for the relevant time period, Defendant John Leeper ("Leeper") was the Principal at MLCHS.

At the beginning of the 2013-14 school year, T.W.'s parents noticed that she was experiencing a significant amount of anxiety, which her mother partially attributed to T.W. being

overwhelmed by the size and environment of her new school, MLCHS.[1] (Clemons Dep. 55:3-11). In December 2013, T.W.'s parents decided to seek professional assistance from Seven Counties Services, Inc.-Shelby County (n/k/a Cornerstone Kentucky) ("Seven Counties"). (Clemons Dep. 53:5-11, 56:19-57:3). On February 10, 2014, a Seven Counties therapist diagnosed T.W. with Asperger's Syndrome Disorder.[2] (Clemons Dep. 70:13-18; Defs.' Mot. Summ. J. Ex. E, at 1-2, DN 35-6). During that school year, Clemons did not formally request an individualized education plan or any accommodation for T.W. (Clemons Dep. 72:1-3, 128:3-20, 134:12-18).

T.W. had participated on the girls' tennis team during her sixth and seventh grade years, and she decided to participate on the 2014 girls' tennis team. (T.W. Dep. 24:22-25:1, Dec. 29, 2016, DN 41-1; Clemons Dep. 43:8-18, 46:13-16, 62:20-63:3; Ricke Dep. 8:5-10, Aug. 25, 2016, DN 41-2). While the parties dispute whether there were tryouts that season and the number of team members, the parties agree that at least fourteen girls were on the 2014 girls' tennis team. (Clemons Dep. 65:9-12; Ricke Dep. 49:22-50:9). As Ricke recalled, T.W. was probably the fourth best singles players on the team at the beginning of that season. (Ricke Dep. 12:7-9).

---

[1] Clemons testified that T.W. had experienced anxiety issues since birth, but Clemons had resisted seeking professional assistance because of the potential stigma associated with a diagnosis. (Clemons Dep. 58:10-60:10, Aug. 30, 2016, DN 41).

[2] This is "a condition on the autism spectrum characterized by impaired social skills. Children with Asperger's disorder lack awareness of social boundaries, among other things, and as a result can unwittingly engage in inappropriate behavior." *Estate of Barnwell by and through Barnwell v. Watson*, 880 F.3d 998, 1001 (8th Cir. 2018); *see also Key v. Berryhill*, No. 6:16-CV-0559-TMP, 2017 WL 4222612, at *3 n.3 (N.D. Ala. Sept. 22, 2017) ("According to Autism Speaks, Asperger Syndrome is 'one of several previously separate subtypes of autism that were folded into the single diagnosis autism spectrum disorder (ASD) with the publication of the DSM-5 diagnostic manual in 2013.' Affected children and adults have 'difficulties in social interaction and exhibit a restricted range of interests and/or repetitive behaviors,' but generally do not have 'significant delays or difficulties in language or cognitive development.'" (citation omitted)).

For the first two months, the team held conditioning and training sessions, and the conditioning included yoga, jumping around, stretching, and running.[3] (Clemons Dep. 63:18-19; T.W. Dep. 30:21-25). During this time while Clemons was seeking a diagnosis from the therapist, T.W. "would come home crying," which she attributed to criticism from what appeared to be singling out by Ricke.[4] (T.W. Dep. 30:25-31:16; Clemons Dep. 70:25-14). Ricke recalled T.W. exhibiting "[m]eltdowns that would happen very quickly if she didn't get her way, running away from the situation. If she was uncomfortable with it she would just like run off the court . . . ." (Ricke Dep. 13:25-14:4). Ricke also noted that T.W. had difficulty dealing with any comment that appeared to be critical of her, and Clemons criticized Ricke for failing to give T.W. positive encouragement and ignoring her during practices and matches. (Ricke Dep. 67:22-25; Clemons Dep. 95:15-18, 96:17-24, 98:13-21, 102:19-25).

Following a bad practice on February 17, 2014, Clemons texted Ricke and disclosed T.W.'s diagnosis of Asperger's Syndrome Disorder. (Clemons Dep. 62:17-19, 74:9-22). Ricke and Clemons then discussed the matter over the telephone and during that conversation Ricke disclosed that he has a son with autism who exhibited similar mannerisms. (Clemons Dep. 74:23-75:3; Ricke Dep. 13:7-15).

On March 21, 2014, and March 27, 2014, T.W. played her first exhibition match and her first varsity match, respectively. (Defs.' Mot. Summ. J. Ex. H, at 7, DN 35-9). The following month, T.W. continued to participate in singles and doubles matches. (Defs.' Mot. Summ. J. Ex. H, at 9-10).

---

[3] After the first day of practice, T.W. entered Clemons' car crying and claimed that Ricke had embarrassed her. (Clemons Dep. 63:22-64:7).

[4] According to Clemons, T.W. "had panic attacks that lasted three hours after practice." (Clemons Dep. 67:22-68:2). While T.W. had previously experienced panic attacks, Clemons testified that they increased in severity during the 2013-14 school year. (Clemons Dep. 69:12-18).

At the end of April, Clemons texted Ricke to find out if T.W. would be participating in the regional tournament, but she did not receive a response. (Defs.' Mot. Summ. J. Ex. H, at 12). Two days later, Clemons sent the same text to Ricke, who replied that T.W. had been beaten out by another player—R.S.—for the last spot at regionals based on a challenge match[5] held about a week before regionals. (Defs.' Mot. Summ. J. Ex. H, at 13; Ricke Dep. 15:5-21, 16:15-16, 17:14-18). Clemons was upset because Ricke had told T.W. previously that she would be participating in the regional tournament, and Clemons was critical of Ricke's failure to tell her that this challenge match was being used to determine who would play in the regional tournament—in part because Clemons would have attended that match if she had known its purpose. (Clemons Dep. 106:1-4, 107:25-108:3, 110:10-111:6). Clemons believed that the challenge match was unfair because T.W.'s opponent purportedly made bad calls during the match. (Clemons Dep. 112:14-113:15, 119:23-120:16). Clemons also opined that Ricke's "choice was discriminatory and the reason why he did it is because he was tired of dealing with [T.W.]." (Clemons Dep. 115:20-22). Ricke believed that R.S. had surpassed T.W. "athletically and just ability-wise," and they were "the only two players [he] thought that there was a question about who would play in that spot." (Ricke Dep. 15:6-8, 20:20-22).

---

[5] "Challenge matches occur between players of the same team and are used to determine which player is the better player." *Cook v. Kudlacz*, 974 N.E.2d 706, 716 (Ohio Ct. App. 2012). "The basic tenet of the challenge match system is that the player who wins is the better player and should play the higher position. Team ladders and weekly or monthly challenges allow all players a fair chance at competing for the various singles and doubles spots." Making Team Lineups, U.S. High Sch. Tennis Ass'n, http://ushsta.org/making-team-lineups/ (last visited Mar. 12, 2018); *see also* Utah High Sch. Athletic Ass'n, Suggestions for Determining a Legitimate High School Lineup, https://uhsaa.org/btennis/2011/LegalLineup.pdf (last visited Mar. 12, 2018). Under the KHSAA's tennis competition rules, the rankings are used for seeding players in the regional singles and doubles tournaments. *See* Ky. High Sch. Athletic Ass'n, 2016-2017 KHSAA Handbook 2, https://khsaa.org/handbook/competitionrules/tncompetitionrules.pdf (last visited Mar. 12, 2018). As Ricke testified, he conducted challenge matches throughout the season. (Ricke Dep. 99:19-24). Likewise, T.W. acknowledged that she could challenge a higher ranked player for the potential opportunity to play varsity matches. (T.W. Dep. 59:10-14).

After T.W. learned that she would be an alternate at regionals, she was devastated and texted her mother threatening to commit suicide. (Clemons Dep. 126:3-10). After Clemons received the text, she drove to school and met T.W. and two school officials in the office. (Clemons Dep. 126:11-12). Clemons recalled disclosing at that meeting T.W.'s diagnosis for the first time to school administration. (Clemons Dep. 126:12-16, 127:24-128:5). At that afternoon's practice, T.W. tried to get answers from Ricke about why she was not selected for the regional tournament, but Clemons claimed that he would not talk to T.W.. (Clemons Dep. 130:8-16). Clemons perceived that Ricke was ignoring T.W., and Clemons responded angrily to him. (Clemons Dep. 130:3-16, 131:10-17). Ricke testified that Clemons yelled at him about his decision at the practice following the announcement, and that other parents in attendance expressed some concern about his safety. (Ricke Dep. 24:8-9, 32:3-34:7). As Clemons noted, the day of this "blow-up" was T.W.'s last practice that season. (Clemons Dep. 124:17-22).

Clemons then withdrew T.W. from MLCHS and decided to homeschool[6] her for the remainder of the school year. (Clemons Dep. 128:19-21; Neihof Dep. 8:3-13, Aug. 25, 2016, DN 35-10). While T.W. was not invited to the end-of-the-year team banquet, she eventually learned about the event and she and Clemons attended anyway. (T.W. Dep. 85:5-17, 85:22-25; Defs.' Mot. Summ. J. Ex. H, at 16). Clemons also felt that Ricke slighted T.W. because she did not receive a bar for her varsity letter at the banquet.[7] (Defs.' Mot. Summ. J. Ex. H, at 16). On June 11, 2014, Clemons wrote a lengthy letter to Neihof raising concerns about Ricke and the girls' tennis team. (Clemons Dep. 66:1-14; Defs.' Mot. Summ. J. Ex. H, at 2-18).

---

[6] Clemons used the term "home hospital" rather than homeschool. (Clemons Dep. 128:19-20, 129:1, 139:9).

[7] According to Ricke, none of the girls received their varsity bars at that event because his daughter misplaced them. (Ricke Dep. 90:22-91:5). He recalled that the girls received them later. (Ricke Dep. 91:5-6).

T.W.'s parents reenrolled her in MLCHS for the 2014-15 school year. (Clemons Dep. 136:8-17). Beginning on October 15, 2014, Clemons held the first of a series of meetings with school officials to discuss T.W.'s eligibility for academic accommodations due to her diagnosis and T.W.'s need for a 504 Individualized Accommodation Plan ("504 Plan").[8] (Clemons Dep. 138:19-140:17; Defs.' Mot. Summ. J. Ex. K, at 2-5, DN 35-12). During a third meeting on January 27, 2015, Clemons mentioned the need to meet with Ricke before the tennis season started "to begin with a clean state", but did not request any accommodations relating to the team. (Clemons Dep. 148:8-150:10; Defs.' Mot. Summ. J. Ex. M, at 4, DN 35-14).

At some point in February 2015, there was a meeting attended by Clemons, Ricke, and other school personnel during which Clemons apologized for what had transpired during the prior season. (Ricke Dep. 43:18-45:23, 46:12-47:10). According to Ricke, that meeting and the events of the prior season—including T.W.'s suicide threat—caused him to decide to exclude T.W. from the 2015 season even before the tryouts began. (Ricke Dep. 57:10-58:4, 59:16-22). He believed it was inadvisable to put T.W. in the same situation that caused her so much anxiety in the prior season.[9] (Ricke Dep. 58:2-4).

---

[8] "Most commonly, parents and the local education agency work together to formulate a § 504 Individualized Accommodation Plan for each handicapped child's education." *Macy v. Hopkins Cty. Bd. of Educ.*, 429 F. Supp. 2d 888, 892 n.2 (W.D. Ky. 2006) (citation omitted).

[9] Ricke also testified:

> Q. . . . So when you leave the meeting in February do you have an expectation of any change of attitude or behavioral modification from TW to start the spring year, spring 2015 year?
> A. I felt like last year was going to be a very big issue and still on her mind a lot, so much that I don't feel like she could get past it and even have a productive year this year, and there were a lot of girls who were just concerned about the team disruptions and those types of things.
> Q. What type of team disruptions?
> A. Like getting screamed at in the middle of practice?
> Q. From, who was screaming?

In the interim, the 2015 girls' tennis season began. Ricke distributed a team handbook to the interested students and announced that tryouts would be conducted during the first three days of practice.[10] (Ricke Dep. 49:13-21; Defs.' Mot. Summ. J. Ex. N, at 3, DN 35-15). The handbook also noted that all interested girls may not make the team and that team members would be selected on the following criteria: "ability, coachability, commitment, attitude, team chemistry or future potential for the team." (Defs.' Mot. Summ. J. Ex. N, at 3).

Bad weather delayed the start of the season, but on March 9, 2015, Ricke conducted the first day of a two-day tryout inside an auxiliary gymnasium at the school. (Ricke Dep. 51:23-52:10, 60:22-61:1, 113:13-21; Clemons Dep. 166:16-167:4). According to Ricke, the tryouts were necessary to select a smaller team because they would only have one or two courts to use for practice. (Ricke Dep. 50:9-51:7). The tryouts involved an initial warmup, followed by team drills, and then individual evaluations. (Ricke Dep. 55:18-23). In those evaluations, Ricke was looking for skills like coachability, footwork, and athleticism. (Ricke Dep. 55:24-56:3). In Ricke's opinion, T.W. did not perform well in the areas of "[f]orehand, backhand, footwork, . . . [and] volley." (Ricke Dep. 56:13-16). Besides her performance in the tryouts, Ricke was aware

---

A.    Keshia Clemons.
Q.    Well, you mentioned one occasion, the practice after the challenge match of 2014. Was there any other occasion that Keshia screamed prior to February of 2015 practice?
A.    No. The tryout was there, but I was concerned about TW. During the practice of the previous year she threw rackets. One hit me. Anytime I needed to talk to her or something like that she'd get very upset.

(Ricke Dep. 65:3-25).

[10] Prior to the season's start, Ricke discussed tennis court availability with the MLCHS's boys' tennis coach and exchanged handbooks with him. (Ricke Dep. 50:25-51:7). The girls' and boys' tennis teams from MLCHS and Shelby County High School ("SCHS") shared the same tennis courts at a local park in Shelbyville, which is called Clear Creek Park Family Activity Center ("FAC"). (Ricke Dep. 16:17-17:1). While there were also tennis courts available at a country club, those courts were not in good shape. (Ricke Dep. 17:2-9).

that T.W. had threatened suicide during the prior school year and he was concerned that he was the source of T.W.'s anxiety. (Ricke Dep. 57:12-58:4). Because he felt it was inappropriate to contribute to that anxiety again, Ricke did not select T.W. for the team.[11] (Ricke Dep. 57:12-58:4). A new player had tried out for the 2015 team and Ricke believed the new player would be the number-one seed on the team, making it less likely than the year before that T.W. would qualify for the regional tournament. (Ricke Dep. 66:15-21). When he told T.W. that she did not make the team, she was hysterical and he was unable to finish talking with her about her tryout. (Ricke Dep. 62:20-63:3; T.W. Dep. 51:8-19, 54:10-12). Ricke shared his decision with Clemons following the completion of the tryouts and expressed his concerns about T.W.'s well-being. (Ricke Dep. 63:14-19, 66:4-15).

On March 20, 2015, Clemons complained about the tryouts and T.W.'s exclusion from the team to MLCHS Principal Leeper. (Clemons Dep. 179:25-180:16). The school then conducted an internal investigation of the tryouts and concluded that the results of the tryouts should be set aside because the tryouts were held in a gymnasium rather than on a tennis court, there was only limited time available for the tryouts, and there were no head-to-head matches. (Clemons Dep. 164:23-165:14, 173:17-174:8; Defs.' Mot. Summ. J. Ex. O, at 2, DN 35-16). The

---

[11] Ricke further noted:

> Q.    Do you think you did everything you could as a coach to accommodate her disabilities?
> A.    I tried, I really did. I love her. If I didn't have, if I didn't have other girls on the team I think it would have been different, but I did have the whole team to think about. I wish it would have been kind of a less acrimonious situation about the previous year, and I wish it could have been a positive experience for her going forward in the 2015 season, but I didn't get any indication of that.

(Ricke Dep. 68:3-12).

athletic director met with Ricke to discuss the tryouts and directed Ricke to put T.W. on the team. (Ricke Dep. 70:6-17, 70:21-24).

On Friday, March 27, 2015, the school committee met with Clemons to discuss T.W.'s 504 Plan and, for the first time, Clemons requested accommodations relating to T.W.'s participation on the tennis team. (Clemons Dep. 158:10-160:14; Defs.' Mot. Summ. J. Ex. P, at 2, 5-6, DN 35-17). Clemons' concerns were memorialized as follows:

> Mrs. Clemons shared her concerns which include: T.W.'s anxiety and fears with being around coach, focus on negative statements, and social interaction in the team environment. Mrs. Graney shared that she met with T.W. earlier this afternoon. She said that was concerned with negative feelings towards certain people and they were able to discuss this when pulling in Mr. Leeper.

> Mrs. Clemons shared that T.W. will be participating in private tennis lessons to help focus. Mrs. Clemons emphasized T.W.'s focus on negativity.

> Mrs. Oakley shared some ideas including: Mrs. Graney can focus on working with T.W. on receiving feedback. Mrs. Clemons said that it's better for T.W. [sic] receives constructive feedback such as always starting feedback with a positive statement and then follow with ways to improve. Address how she could get better, not that something was done wrong. Mrs. Oakley also suggested doing role play with in terms of feedback and even going to observe a couple of tennis practices. Written feedback could also be looked into as an option. Peer feedback, worded in a positive way. Mrs. Graney could then provide feedback to the coaches with T.W.'s perception to help that relationship.

> In terms of social interactions, Mrs. Clemons shared that a peer or buddy on the tennis team could help her by modeling positive group interactions. Mrs. Clemons was good with this idea and allowing that other student to being aware of T.W.'s needs. In terms of anxiety and fears with interaction with coach, working on receiving meaningful feedback will help improve this relationship.

(Defs.' Mot. Summ. J. Ex. P, at 5). After discussing the accommodations addressed in prior meetings, the group discussed the following additional accommodation for the 504 Plan: "add peer mentor/encourager to 504 Accommodations for social interactions-█████? When possible [pair] T.W. with a teammate who will model positive interactions and respond well to T.W. Someone to guide her back to the social interaction. She needs encouraging to interact with

others.  She responds well to older peers."[12]  (Defs.' Mot. Summ. J. Ex. P, at 6).  Finally, the minutes from the meeting noted:

> Mom's concerns are with T.W.'s anxiety and fears of being around the coach, her focus on negative statements and how they will not leave her mind, and her social interactions with teammates.  At this time, mom felt additions address her concerns.  Mom can request a meeting any time to request revisions.

(Defs.' Mot. Summ. J. Ex. P, at 6).

On Tuesday, March 31, 2015, T.W. participated in an exhibition match in her first activity as a member of the girls' tennis team.[13]  (T.W. Dep. 60:21-61:8; Clemons Dep. 183:20-184:12).  The next day at practice, T.W. was to play challenge matches against the four ranked singles players on the team.[14]  (T.W. Dep. 61:21-62:5; Clemons Dep. 24:12-15, 183:17-186:10, 187:10-188:5, 191:22-192:5, 192:17-21).  As T.W. conceded, she had not yet been seeded that season.  (T.W. Dep. 62:11-16).  T.W. played and lost matches against B.N. and A.Q.—the two top-ranked players.  (T.W. Dep. 63:3-7, 64:19-24, 93:10-18; Clemons Dep. 189:5-8).  After playing those matches, T.W. informed Ricke that she was too tired to play any further matches

---

[12] The blacked portion of the quoted material was redacted when T.W.'s name was redacted.  It is unclear what the redacted word is in this instance.

[13] Leeper instructed Ricke to prepare a document outlining the tennis activities for T.W. for the week of March 30, 2015, which was her first week of participation.  (Ricke Dep. 82:5-83:7; Defs.' Mot. Summ. J. Ex. R, at 1, DN 35-19).  That document tentatively listed challenge matches on March 31, April 1, and April 2.  (Defs.' Mot. Summ. J. Ex. R, at 2; Clemons Dep. 183:25-184:4).

[14] As part of the effort to provide accommodations to T.W., two district employees attended this practice, and a written summary of observations was prepared and submitted to Leeper.  (Defs.' Mot. Summ. J. Ex. Q, at 2-4, DN 35-18).  Some of their observations included:  (i) T.W. frequently became disengaged from practice to talk with or seek feedback from Clemons; (ii) T.W. expressed frustration with events that occurred during practice; (iii) on several occasions, T.W. declined join the huddle when Ricke was speaking to the team; and (iv) T.W.'s refusal to play a match and to assist with her teammates in picking up tennis balls around the court.  (Defs.' Mot. Summ. J. Ex. Q, at 3-4).

that day.[15]  (Ricke Dep. 101:16-17, 102:21-103:3, 104:20-22; Clemons Dep. 190:4-9; T.W. Dep. 61:21-62:10, 63:19-64:5, 64:19-25).

Clemons perceived the challenge matches as a setup because T.W. "had to beat one of the four in order to participate in an actual match."[16]  (Clemons Dep. 186:9-10).  She further testified:

> With the knowledge that [Ricke] wanted [T.W.] to play the number one, the number two, the number three, and the number four in that order, with knowing [T.W.]'s anxiety, and already having been four weeks into the tennis season without her getting to participate with the girls at all, and having school administration come witness the match, he needed her to act out to prove his point and why he couldn't have her on the team.

(Clemons Dep. 187:10-18).  Ricke testified about those challenge matches as follows:

> Q.     .  .  .   So your expectation on Wednesday, April 1st when the challenge matches began that TW was to play all of these [top-ranked] players?
> A.     Pro sets.
> Q.     Define pro sets for me.
> A.     Pro set, a normal match you would play first to 6 by 2.  Typical matches are going to range, oh, if it's somewhat of a competitive match it might be 20 games total played.  Challenge matches with a pro set is you just play to 8, that's it, first 8.
> Q.     Whoever wins 8—are they sets?
> A.     Games.  So it's a quicker way to try to get an idea of who's better than who.
> Q.     So your expectation was that TW was going to play 32 games?
> A.     I didn't really expect her to get through all of them, but that's if we had time through the hour and a half I would have given her the opportunity to play all four.
> Q.     Okay.  You said hour and a half.  Why did you say just an hour and a half?
> A.     That's all our practices last.
> Q.     So after an hour and a half there were no—you did not have an expectation that any other challenge matches would occur?

---

[15] Clemons testified that she and T.W.'s stepfather decided that she should stop after the two challenge matches because "[i]t was pathetic."  (Clemons Dep. 185:20-24).

[16] Clemons also expressed her belief that this setup may have been unrelated to the tennis team and noted "[t]he conversation [Clemons] had with Mr. Leeper the Monday before was implying that he was going—he had enough reasons to suspend T.[W.] from school because she was acting out the Friday before.  That was his claims."  (Clemons Dep. 188:10-16).

> A. No. If she was in the middle of a match or something and it was fairly competitive I would let her go. I was usually pretty punctual about ending practice on the hour and a half mark.

(Ricke Dep. 94:12-95:15). Ricke further explained that T.W. was to be given a chance to complete the challenge matches at the next practice. (Ricke Dep. 94:1-11).

After leaving practice with T.W. on April 1, 2015, Clemons emailed Leeper to inform him that she was withdrawing T.W. from school and explained what had happened during practice. (Clemons Dep. 192:22-193:6; T.W. Dep. 68:6-16; Defs.' Mot. Summ. J. Ex. S, at 2, DN 35-20). The next day, Clemons wrote a letter to Neihof informing him of her decision to homeschool T.W. for the remainder of the school year. (Clemons Dep. 193:6-8; Defs.' Mot. Summ. J. Ex. T, at 2, DN 35-21).

On June 16, 2015, Plaintiff filed this action asserting claims under Title IX of the Education Amendments of 1972 ("Title IX"), Section 504 of the Rehabilitation Act of 1983, Equal Protection Clause of the Fourteenth Amendment, and the Kentucky Constitution. (Compl. ¶ 12, DN 1). Following the completion of discovery, the parties have filed competing dispositive motions, which are ripe for decision.

## II.    JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction. *See* 28 U.S.C. § 1331.

## III.    STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.  DISCUSSION

The parties have filed dueling motions for summary judgment. While Plaintiff's motion is limited to whether she is entitled to summary judgment against Defendants on her Title IX claim, Defendants have moved for summary judgment on all of Plaintiffs' claims. The Court will address all of the claims in the context of the pending motions below.

### A.  Jurisdictional Arguments

#### 1.  *Standing*

At the outset, Defendants seek summary judgment on Clemons' Title IX claim because Clemons has failed to prove she has standing to assert that claim. (Defs.' Mem. Supp. Mot. Summ. J. 16-18, DN 35-1). In particular, they assert that T.W. was placed on the 2015 girls'

tennis team and was therefore not denied the right to participate in violation of Title IX. (Defs.'
Mem. Supp. Mot. Summ. J. 18).

Under the U.S. Constitution, "[t]he judicial Power of the United States" is vested in the
federal courts, and that power extends to all "[c]ases" and "[c]ontroversies . . . ." U.S. Const. art.
III, §§ 1-2. As the Supreme Court has explained, the doctrine of standing is "rooted in the
traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,
1547 (2016). To establish standing, a plaintiff must demonstrate an "injury in fact" that is
"fairly . . . trace[able]" to the defendant and will "likely . . . be 'redressed by a favorable
decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) (quoting *Simon v. E. Ky.
Welfare Rights Org.*, 426 U.S. 26, 41-43 (1976)). An injury in fact is "an invasion of a legally
protected interest that is concrete and particularized and actual or imminent, not conjectural or
hypothetical." *Spokeo, Inc.*, 136 S. Ct. at 1548 (internal quotation marks omitted) (quoting
*Lujan*, 504 U.S. at 560). A plaintiff as "[t]he party invoking federal jurisdiction bears the burden
of establishing these elements." *Lujan*, 504 U.S. at 561 (citation omitted).

In this case, the Court agrees with Defendants' contention that there is no actual case or
controversy regarding the tryouts for the 2015 girls' tennis team because T.W. was allowed to
join the team. Clemons also argues, however, that Defendants violated Title IX by not
permitting T.W. to participate in varsity matches as a team member. (Pl.'s Resp. Defs.' Mot.
Summ. J. 5-7, DN 40). Because Plaintiff would have standing to assert a claim regarding her
participation, the Court will consider the merits of this claim.

### 2. *Exhaustion of Administrative Remedies*

Defendants also contend that Clemons failed to exhaust her administrative remedies as to
her Rehabilitation Act claim. (Defs.' Mem. Supp. Mot. Summ. J. 24-26). Because of this

failure, Defendants seek dismissal of this claim without consideration of its merits.  (Defs.'

Mem. Supp. Mot. Summ. J. 24-26).

The parties recognize that the Rehabilitation Act does not contain an exhaustion

requirement.  As the Sixth Circuit has explained, however:

> When a claim under this statute involves public education, we must consider a
> provision in the Individuals with Disabilities Education Act (IDEA).  The IDEA
> states that, before bringing claims under other statutes (specifically listing the
> Rehabilitation Act) seeking "relief that is also available under this subchapter,"
> the administrative procedures in § 1415 must be exhausted to the same extent
> "had the action been brought under this subchapter."  That language refers to
> Subchapter II of Chapter 33 of the IDEA, a detailed provision setting forth
> procedures to be established by state educational agencies that receive federal
> assistance, "to ensure that children with disabilities and their parents are
> guaranteed procedural safeguards with respect to the provision of a free
> appropriate public education by such agencies."

*S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 641-42 (6th Cir. 2008) (internal citation omitted)

(quoting 20 U.S.C. § 1415(a)).  In arguing that such failure should be excused,[17] Clemons

contends:

> Defendants have not produced any evidence showing that Clemons was fully
> informed of her procedural rights under the IDEA, yet the record is replete with
> evidence that she was not.  For example, when questioned about the forms that
> Clemons filled out to notify Defendants of T.W.'s disability, Clemons did not
> know what those forms were more than one calendar year after the institution of
> the action.  Additionally, Clemons was not aware of the fact that SCBE staff
> could intervene on T.W.'s behalf to assist with her disability.

---

[17] Regarding Clemons' failure to exhaust the available remedies, the Court must be mindful of
her conscious decision to withdraw T.W. from the school system following T.W.'s two-day
experience on the 2015 team.  As the Sixth Circuit has recognized, "parents may not avoid the
state administrative process through 'the unilateral act of removing their child from a public
school.'"  *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 918 (6th Cir. 2000) (quoting *Doe by
and through Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir. 1989)).  In the case *sub judice*, the
record reflects that Clemons withdrew T.W. from the Shelby County School District twice.
(Clemons Dep. 15:15-20; Neihof Dep. 8:3-13; Defs.' Mot. Summ. J. Exs. S-T).  Thus, Clemons'
conscious choice to withdrawal T.W. from school system cannot preclude the satisfaction of this
obligation.

(Pl.'s Resp. Defs.' Mot. Summ. J. 13 (emphasis omitted) (internal citations omitted) (citation omitted)). That argument, however, is misplaced. Clemons' failure to recall what forms she completed more than a year before is merely proof of her lack of recollection at the time of her deposition, not an excuse for her failure to exhaust administrative remedies.

As Clemons notes, Defendants had an affirmative obligation to notify her of her procedural rights under the IDEA. (Pl.'s Resp. Defs.' Mot. Summ. J. 13 (citing 34 C.F.R. § 300.504)). The documentation from the 504 Plan meetings reflects that Clemons confirmed—by her initials—that she had previously "received a Section 504 Parent Rights Statement and [did] not need the rights further explained at [that] time." (Defs.' Mot. Summ. J. Ex. K, at 3; Defs.' Mot. Summ. J. Ex. M, at 3; Defs.' Mot. Summ. J. Ex. P, at 3). Neither party, however, has provided the Court with a copy of the Section 504 Parent Rights Statement that Clemons received, so it is not possible to determine whether that document sufficiently apprised Clemons of her due process rights.

In the absence of proof that Defendants affirmatively notified Clemons of her due process rights and because the claims articulated in the Complaint do not include a failure to accommodate claim, the Court cannot conclude as a matter of law that she was required to exhaust her administrative remedies as to her Rehabilitation Act claim. Accordingly, the Court will consider the merits of this claim.

### B. Individual Capacity Claims

Defendants seek dismissal of the individual capacity claims asserted against the Individual Defendants under Title IX. (Defs.' Mem. Supp. Mot. Summ. J. 16). Title IX only applies to recipients of federal funding, and the Sixth Circuit has held that there are no individual capacity claims under Title IX. *See id.*; *see also Condiff v. Hart Cty. Sch. Dist.*, 770 F. Supp. 2d

876, 881 (W.D. Ky. 2011) ("The Title IX claim against Superintendent Line in his individual capacity is dismissed because there is no individual liability for a Title IX claim. A Title IX claim may be brought only against the funding recipient." (internal citations omitted) (citation omitted)). Accordingly, the Court will dismiss the Title IX individual capacity claims asserted against Defendants Ricke, Neihof, and Leeper.

### C. Merits of Claims

In the Complaint, Clemons has asserted claims under Title IX, Section 504 of the Rehabilitation Act, and the Equal Protection Clause of the U.S. Constitution. Each of these claims, the applicable law, and the evidence in the record are discussed below.

#### 1. *Title IX*

Under Title IX, no person on the basis of his or her sex shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). "Title IX proscribes gender discrimination [against employees and students] in education programs or activities receiving federal financial assistance." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514 (1982); *see also Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999) ("Title IX was Congress's response to significant concerns about discrimination against women in education." (citing *Bell*, 456 U.S. at 523-24 n.13)).

Based on the allegations in the Complaint, it appears that Clemons is challenging whether Defendants provided equal athletic opportunities to girls participating on the tennis team at MLCHS. As the Sixth Circuit has noted in discussing Title IX's implementing regulations:

> [T]he regulations *do* require that institutions provide gender-blind equality of athletic opportunity to its students. 34 C.F.R. § 106.41(c). An institution's compliance with this requirement is determined with reference to a number of factors, including "[w]hether the selection of sports and levels of competition

effectively accommodate the interests and abilities of members of both sexes[.]" 34 C.F.R. § 106.41(c)(1). An institution "may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."

*Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994) (citation omitted). The policy interpretation for the applicable regulations also explains:

> The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible.

44 Fed. Reg. 71,413, 71,415 (Dec. 11, 1979); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1110 (S.D. Cal. 2012) ("Compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision of locker rooms and other facilities and services, and publicity." (citing 34 C.F.R. § 106.41(c))).

In this case, Clemons alleges that Defendants violated Title IX relating to T.W.'s participation in the girls' tennis team. In particular, Clemons asserts that Defendants violated Title IX because only the girls' tennis team had tryouts for the 2015 season. (Pl.'s Resp. Defs.' Mot. Summ. J. 5-9; Pl.'s Mot. Partial Summ. J. 3-5, DN 34). Clemons also contends that the

girls' team was not given sufficient court space during the 2015 season.[18]  (Pl.'s Reply Mot. Summ. J. 2, DN 44; Pl.'s Mot. Partial Summ. J. 3-5).

Based on the Court's review of the record, there is no direct evidence to support this claim.  Because Clemons must rely on circumstantial evidence, the Court will apply the *McDonnell Douglas* burden shifting framework to her Title IX claim.  *See Waters v. Drake*, 222 F. Supp. 3d 582, 596 (S.D. Ohio 2015) (citation omitted) (applying the analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Under the *McDonnell Douglas* burden shifting scheme, Clemons has the initial burden of proving that:  (i) T.W. is a member of a protected class; (ii) T.W. was subject to an adverse educational action; (iii) Defendants treated similarly-situated students who were not members of T.W.'s protected class more favorably; and (iv) T.W. was qualified.  *See Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 910 (11th Cir. 2013) (citation omitted). Clemons cannot meet her burden because Defendants have established that more girls than boys were given the opportunity to play tennis on the MLCHS teams in 2015, as evidenced by the need for tryouts for the girls' team.  Because Clemons has failed to show that boys were treated more favorably than girls during her two-day tenure on the 2015 team, the Court will grant summary judgment for Defendants on this claim.[19]

---

[18]  Many of the cases quoted or discussed by Clemons in support of the Title IX claim are misattributed to Title IX claims, when they are actually from cases involving equal protection. (Pl.'s Resp. Defs.' Mot. Summ. J. 6).

[19]  Even if Clemons had met her initial burden, Defendants have met their burden to articulate a legitimate, non-discriminatory reason for their decision.  *See Waters v. Drake*, 222 F. Supp. 3d 582, 601 (S.D. Ohio 2016) (citation omitted).  The girls' and boys' tennis teams from MLCHS and SCHS—comprising roughly 57 players—shared six tennis courts at FAC, and at times all of the courts would be unavailable because of tennis matches.  (Ricke Dep. 16:17-17:1, 73:13-74:11).  In addition, only a limited number of players could participate in the varsity matches. (Ricke Dep. 16:17-17:1, 50:25-51:7).  Clemons has also not proven pretext, which can established "by showing that the proffered reason:  '(1) has no basis in fact; (2) did not actually

*McCormick v. School District of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004), a case cited

by Clemons, is inapposite. *McCormick* involved the scheduling of a girls' soccer season at a

time that precluded eligibility to participate in the regional and state championship. *See id.* at

284. Clemons erroneously cites *McCormick* to support her assertion that only holding tryouts for

the girls' teams proves disparate treatment in violation of Title IX. (Pl.'s Resp. Defs.' Mot.

Summ. J. 5). Coordinating court time between tennis teams from two different high schools is

not analogous to one school's scheduling of its girls' soccer season as in *McCormick*.

---

motivate the adverse employment action; or (3) was insufficient to warrant the adverse action.'" *Id.* (citation omitted). Clemons' contention that the tryouts requirement was pretext for gender discrimination and that the girls' team was denied the same the use of the tennis courts is unfounded. (Pl.'s Resp. Defs.' Mot. Summ. J. 6-9). She has not refuted Defendants' contention that: (i) Ricke believed there were too many players on the 2014 team, which was his stated reason for holding tryouts for the 2015 team (when ten to twelve girls showed up); or (ii) there was barely enough interest in the boys' team to field a team at all, which rendered tryouts unnecessary. (Ricke Dep. 51:1-11). Clemons' subjective belief that more girls should have been allowed to participate on the team is not evidence of pretext. *See Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 604 (E.D. Pa. 2009) ("It is well established, however, that mere pronouncements or subjective beliefs . . . [are] not a substitute for competent evidence." (alterations in original) (internal quotation marks omitted) (citation omitted)); *see also Heike v. Guevara*, 519 F. App'x 911, 918 (6th Cir. 2013) ("[I]t may be appropriate to give coaches somewhat more deference than ordinary employers. But any such leeway comes from the broad range of legitimate, nondiscriminatory reasons a coach may have for deciding who plays, how much they play, and whether they stay on the team from year to year . . . ."). Clemons has cited no authority that Title IX mandates that all interested girls be permitted to participate on a high school athletic team or that the use of tryouts to select team members under these circumstances violates Title IX. Likewise, it is not a court's responsibility to micromanage a coach's decision of how to select team members when that decision is not based on a student's gender and that is consistent with the number of team members needed for that particular sport. Even if it were imprudent or short-sighted to have fewer girls on the 2015 team than the prior year, such a decision does not constitute Title IX violation. Of crucial significance here is the fact that even with tryouts, more girls than boys were afforded an opportunity to play on the MLCHS tennis teams in 2015, and Clemons has presented no proof to the contrary. With respect to the tryouts, Clemons has no basis for her complaint because T.W. *was put on the team*. Similarly, the issue of court availability does not support pretext because four teams shared those courts, and the same logistical challenges were presumably faced by all teams using those courts—both girls' and boys' teams from MLCHS and SCHS. Save for her naked assertions, Clemons has failed to prove pretext.

As discussed above, Clemons has failed to satisfy her burden of proving a prima facie case on her Title IX claim. Accordingly, the Court will grant summary judgment for Defendants on this claim.

### 2. *Section 504 of Rehabilitation Act*

Clemons also alleges that Defendants violated Section 504 of the Rehabilitation Act.[20] (Pl.'s Resp. Defs.' Mot. Summ. J. 13-16). In relevant part, the Rehabilitation Act provides that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . . 29 U.S.C. § 794(a). In particular, Clemons contends that T.W. was discriminated against because of her disability. As with Clemons' other claims, she lacks direct evidence, and the Court will apply the *McDonnell Douglas* burden shifting scheme to this claim. *See Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (citations omitted).

### a. Prima Facie Case

Under the burden shifting scheme, Clemons has the initial burden of proving a prima facie case of discrimination by establishing that:

> (1) [she] is disabled under the statutes, (2) [she] is "otherwise qualified" for participation in the program, and (3) [she] "is being excluded from participation in, denied the benefits of, or subjected to discrimination" because of [her]

---

[20] In her response, Clemons asserts that she notified the school district of T.W.'s disabilities in May 2014. (Pl.'s Resp. Defs.' Mot. Summ. J. 14). While not addressed by the parties, however, any alleged discriminatory conduct by Defendants that occurred more than one year before the filing of this lawsuit on June 16, 2015, would be barred by Kentucky's one-year statute of limitations applicable to personal injury actions, which applies to claims brought under Section 504 of the Rehabilitation Act. *See Hall v. Knott Cty. Bd. of Educ.*, 941 F.2d 402, 407-08 (6th Cir. 1991) (stating that KRS 413.140(1)(a) would apply to Section 504 claims). The last event of the 2014 tennis season was the banquet held on May 27, 2014, and as a result, any alleged discriminatory acts during the 2014 season would be time-barred. (Defs.' Mot. Summ. J. Ex. H, at 16).

disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance.

*Id*. at 682-83 (citation omitted). For the purpose of Defendants' motion, the Court will assume that Plaintiff could satisfy her burden of proving a prima facie case.

### b. Legitimate, Non-discriminatory Reason

The burden would then shift to Defendants to articulate a legitimate, nondiscriminatory reason for challenge matches and ranking of players higher than T.W.. *Id.* at 683 (citation omitted). Based on the record, Defendants have satisfied their burden.

Defendants point to the nondiscriminatory requirement of challenge matches. As Ricke testified, all of the members of the 2015 girls' tennis team had to compete in challenge matches to earn the opportunity to play in competitive varsity matches. (Ricke Dep. 99:19-100:12; Defs.' Reply Mot. Summ. J. 9, DN 42). As the record reflects, only the top four-ranked players participated in varsity matches. (Ricke Dep. 98:3-8). Thus, for T.W. to be eligible to play in the varsity matches, she would have had to beat one of the four top-ranked players on the team. The use of the challenge matches for seeding purposes was not unique to this season because Ricke had used the matches in the prior season to select another player over T.W. for regionals. Accordingly, Defendants have satisfied their burden.

### c. Pretext

Because Defendants satisfied their burden of articulating a legitimate, nondiscriminatory reason for the allegedly discriminatory acts, "[t]he ultimate burden of persuasion would rest with [Plaintiff] [] to establish that [Defendant's] [] proffered reasons were merely a pretext for discrimination." *Cox v. U.S. Dep't of Navy*, No. 302CV467S, 2005 WL 3054095, at *7 (W.D. Ky. Nov. 10, 2005) (citations omitted). As this Court has previously noted, the Rehabilitation Act requires proof that the discriminatory act or treatment was "solely by reason of [T.W.'s]

disability." *Taylor v. Colo. State Univ.*, No. 5:11-CV-00034, 2012 WL 6115596, at *8 (W.D. Ky. Dec. 10, 2012) (citing 42 U.S.C. § 794(a); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315-16 (6th Cir. 2012)); *see also Jones v. Potter*, 488 F.3d 397, 409-10 (6th Cir. 2007) ("[T]he Rehabilitation Act . . . requires Jones to prove that he was fired '*solely* by reason of . . . his disability.'" (quoting *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995))).

Clemons argues that T.W. was discriminated against because of her disability because of: (i) disparaging remarks made by Ricke about T.W.; (ii) T.W.'s participation in "a challenge match by Ricke where she was forced to play the top four seeds consecutively" and T.W.'s exclusion from varsity matches; (iii) her lack of invitation to the tennis banquet at the end of the 2014 season; (iv) the omission of T.W.'s name from a newspaper article; (v) the exclusion of T.W. from team meetings; and (vi) the criteria in the 2015 girls' tennis team handbook. (Pl.'s Resp. Defs.' Mot. Summ. J. 16). Based on the evidence in the record, however, there is insufficient evidence of pretext.[21]

First, Clemons' criticism of Ricke's remarks does not suffice.[22] Courts have held that disparaging marks were insufficient to prove disability discrimination claims. *See Rivera-Cotto*

---

[21] Clemons' reliance on T.W.'s lack of an invitation to the tennis team banquet following the 2014 season does not prove pretext. Besides the fact that this claim would be time-barred to the extent it related to the 2014 season, T.W. conceded during her deposition that she quit the tennis team and withdrew from the school district before the banquet occurred. (T.W. Dep. 85:8-17). This gripe is ludicrous in light of the fact that T.W. and her mother *did attend* the banquet. (Defs.' Mot. Summ. J. Ex. H, at 16).

[22] During T.W.'s deposition, she testified that Ricke liked team members with bubbly personalities and who were sociable as follows:

> Q.   And did he ever say he didn't want to include you in things because of Asperger's?
> A.   No, but his actions reflected it.

*v. Rivera*, 38 F.3d 611, 614 (1st Cir. 1994) (holding that disparaging remarks were insufficient to support a claim of discrimination based on a hearing impairment under the Rehabilitation Act); *Gooden v Lew*, No. 1:13-CV-0298-MHC-CMS, 2015 WL 13333494, at *12 (N.D. Ga. Aug. 3, 2015) (finding that disparaging remarks about requests for assistive equipment did not preclude summary judgment under the Rehabilitation Act).

From Clemons' testimony, it is apparent that she took great umbrage with Ricke's coaching of the tennis team during the 2014 and 2015 seasons. In particular, she disagreed with his use and timing of the challenge matches, which she perceived as being unfair to T.W.. While Clemons disputes whether challenge matches were used during the 2014 season, the record reflects that all of the girls on the team played challenge matches against each other to earn the opportunity to play varsity matches and earn a letter during the 2015 season. (Ricke Dep. 15:1-15, 99:19-24, 100:2-9). This fact undermines any contention that Defendants discriminated against T.W. because of her disability. T.W. was treated the same as all of the other girls in terms of having to play their way into the lineup.

Likewise, T.W. admitted that she had not yet been seeded at the time the challenge matches were held the week of March 30, 2015. (T.W. Dep. 62:15-19). When T.W. participated in her first team activity on Tuesday, March 31, 2015, she was allowed to play in an exhibition match. The following day, T.W. played challenge matches against the top two ranked players on the team, which she lost, and was supposed to play the third- and fourth-ranked players as well. She would have been given that same opportunity at the next practice, but instead T.W. quit the

---

        Q.     Okay. And did he ever tell you that you weren't sociable because of your Asperger's?
        A.     No. He just said that I didn't really talk.

(T.W. Dep. 106:17-22).

team.  (Defs.' Mot. Summ. J. Ex. R, at 2; Clemons Dep. 183:25-184:4).  Again, in this regard T.W. was treated just like non-disabled team members and she has produced no proof of disparate treatment in requiring her to play challenge matches.

Clemons has also failed to present any evidence that T.W.'s omission from the list of players in the newspaper article can be attributed to Defendants.  As Clemons conceded during her deposition, she had no evidence that Defendants had any involvement in the omission of T.W.'s name from the newspaper article.  (Clemons Dep. 204:2-8).  Therefore, Plaintiff cannot prove that such omission was attributable to Defendants—much less that it evidenced discriminatory animus.

Similarly, the allegation that T.W. was excluded from team meetings is insufficient to establish pretext.[23]  While Plaintiff's Answers to Interrogatories imply such an exclusion,[24] neither Clemons' nor T.W.'s deposition provide any specific facts as to the number of times that T.W. was excluded or whether those meetings occurred during the 2014 or 2015 season.  In addition, the unverified proof Plaintiff relies upon to prove pretext—Clemons' Answers to Interrogatories—contains allegations that are too lacking in specificity to create a genuine issue of material fact.  *See Citizens Bank of Elizabethton v. Ken-Penn Amusement, Inc.*, 798 F. Supp.

---

[23] While not mentioned in her response, Clemons' Answers to Interrogatories stated that "T.W. would sit at a separate table when the team was talked to at practice; and Coach Ricke would exclude her from team meetings by talking to the other girls."  (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 2, at 15, DN 40-2).  That answer suggests that T.W. chose to sit separately from the rest of the team and does not indicate that any of Defendants prevented T.W. from sitting with the rest of the team.

[24] Plaintiff has not provided a verified copy of the Answers to Interrogatories to the Court.  A party's unverified "answer [to interrogatories] may not be considered in opposition to the motion . . . for summary judgment."  *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *see also Tesco Corp. v. Weatherford Int'l, Inc.*, 904 F. Supp. 2d 622, 636 (S.D. Tex. 2012) ("Verified or sworn pleadings are competent summary judgment evidence; unverified answers to interrogatories and interrogatories not based on personal knowledge are not."  (citations omitted)).

268, 271 (W.D. Pa. 1992) (granting the defendant's summary judgment motion and stating that "[a]ffidavits which are merely conclusory and lacking in specific facts may be properly disregarded by the court." (citation omitted)). As T.W. conceded, however, Ricke never indicated that he excluded her because of her disability or that she was not sociable because of her disability. (T.W. Dep. 106:17-22).

As for the team handbook, Clemons contends that "the handbook had been created specifically . . . to try to cut [T.W.]." (Clemons Dep. 169:4-6). That belief is based on the fact that there had neither been a handbook nor tryouts in past years. (Clemons Dep. 169:9-13). Plaintiff's subjective beliefs, however, are insufficient to prove pretext. *See Stringer v. N. Bolivar Consol. Sch. Dist.*, Nos. 4:15CV107-NBB-JMV, 4:15CV108, 4:15CV109, 4:15CV110, 2017 WL 1032019, at *3 (N.D. Miss. Mar. 15, 2017) ("It is well settled, however, that a complainant's own subjective belief of discrimination, no matter how sincere, cannot alone serve as a basis for judicial relief." (internal quotation marks omitted) (citation omitted)); *Murphree v. Potter*, 226 F. Supp. 2d 826, 835 (N.D. Miss. 2002) ("[T]he plaintiff's assertion of pretext must rest upon sufficiently specific, substantive reasons beyond self-serving, subjective or speculative allegations." (citation omitted)). Regardless of any supposed hidden agenda to keep T.W. off the team based upon the handbook, the fact remains that she was placed on the team by Leeper and then quit after two days. The handbook had nothing to do with T.W.'s decision to quit the team.

For these reasons, the Court concludes that no reasonable jury could find that Defendants discriminated against T.W. solely by reason of her disability. The Court will grant summary judgment for Defendants on this claim.[25]

### 3. Equal Protection

Finally, Clemons alleges that Defendants violated T.W.'s rights under the Equal Protection Clause of the U.S. Constitution. In response to Defendants' motion, Clemons asserts that they intentionally discriminated against T.W. because of her disability but fails to specify any discriminatory conduct in support of this claim. (Pl.'s Resp. Defs.' Mot. Summ. J. 17).

The Fourteenth Amendment's "Equal Protection Clause requires the States (and their subdivisions) to treat like people alike." *Gohl*, 836 F.3d at 684 (citation omitted). "Disparate treatment 'based on disability' violates the Equal Protection Clause if it 'lack[s] a rational relationship to a legitimate governmental purpose.'" *Id.* (citation omitted).

To prevail on this claim, Clemons has "the burden of showing that [Defendants] intentionally treated [T.W] differently—because [she] is disabled—than similarly situated students who were like [her] in all relevant respects." *Id.* (internal quotation marks omitted)

_____

[25] In Clemons' response, she argues that Defendants failed to provide reasonable accommodations in violation of Section 504 of the Rehabilitation Act. (Pl.'s Resp. Defs.' Mot. Summ. J. 13-15). In the Complaint, however, she never asserted a failure to accommodate claim. In fact, the only mention of an accommodation is the following allegation: "the Plaintiff(s) voiced numerous protests in regard to Defendant Ricke's verbal discrimination of T.W.; which was clearly in violation of T.W.'s accommodations pursuant to Federal and State law . . . ." (Compl. ¶ 14). That allegation, however, is insufficient to state a failure to accommodate claim. Even if Clemons had stated such a claim, it would fail. On Friday, March 27, 2015, there was a 504 Plan meeting to discuss T.W.'s potential accommodations on the tennis team. (Defs.' Mot. Summ. J. Ex. P, at 2, 5-6). Three days later on Wednesday, April 1, 2015, Clemons removed T.W. from the tennis team after that day's practice (which included T.W. playing challenge matches) and withdrew T.W. from school, thereby depriving Defendants of a meaningful opportunity to implement the identified accommodations. (Ricke Dep. 91:8-11, 94:12-95:15; Defs.' Mot. Summ. J. Ex. R, at 1; Defs.' Mot. Summ. J. Ex. S, at 2; Defs.' Mot. Summ. J. Ex. T, at 2). Under these circumstances, the Court would have dismissed the failure to accommodate claim even if properly brought.

(citing *S.S.*, 532 F.3d at 458). In addressing this claim in response to Defendants' motion, Clemons failed to point to or any identify any evidence regarding how similarly-situated non-disabled students were treated.[26] Thus, she has failed to present any evidence upon which a jury could conclude that the conduct occurred because of T.W.'s disability. Accordingly, Clemons' equal protection claim fails for similar reasons as her other claims in this action.

## V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 35) is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment (DN 34) is **DENIED**.

**Greg N. Stivers, Judge**
**United States District Court**
March 23, 2018

cc:    counsel of record

---

[26] As discussed previously, Plaintiff has no equal protection claim based on gender arising from the tryouts because T.W. was put on the 2015 team. *See also Croteau v. Fair*, 686 F. Supp. 552, 554 (E.D. Va. 1988) ("[T]here is no constitutional or statutory right to play any position on any athletic team. Instead, there is only the right to compete for such a position on equal terms and to be free from sex discrimination in state action."). In the Complaint, Clemons also purports to assert a claim for a violation of the Kentucky Constitution. (Compl. ¶ 7). While she fails to identify a specific state constitutional provision, the Complaint can be fairly construed to assert an equal protection claim under the Kentucky Constitution. As a sister court has noted, "[t]he Kentucky equal protection guarantee is the equivalent of that provided by the Fourteenth Amendment to the United States Constitution." *Holder v. Robbins*, No. 05-328-JBC, 2006 WL 751238, at *7 (E.D. Ky. Mar. 21, 2006) (citation omitted); *see also D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003) ("Citizens of Kentucky are entitled to equal protection of the law under the 14th Amendment of the United States Constitution and Sections 1, 2, and 3 of the Kentucky Constitution." (citation omitted)). Thus, while neither party has addressed the Kentucky constitutional claim in the pending motions, summary judgment is warranted on such claim for the same reasons as the federal equal protection claim and will be dismissed.